# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **VICTOR BOYCE,**<br><br>    **PLAINTIFF,**<br><br>    **V.**<br><br>**INDEPENDENT BREWERS UNITED<br>CORPORATION, ET AL.,**<br><br>    **DEFENDANTS.** | **CASE NO.** 15-cv-02263-YGR<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

Plaintiff Victor Boyce brings this action against defendants Independent Brewers United Corporation and ("IBUC") and North American Breweries, Inc. ("NAB") pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. section 201 *et seq.* ("FLSA"). In short, plaintiff claims that he was misclassified as an exempt employee under the FLSA between July 10, 2012 through September 27, 2013 (the "Relevant Period"),[1] thus entitling him to overtime pay for that period. Specifically, plaintiff claims $41,125.62 in unpaid overtime, an equal amount in liquidated damages or in the alternative prejudgment interest in the amount of $18,781.69, plus $16,470.74 in costs and $226,009.00 in attorney's fees.

The Court held a five-day bench trial in this matter, in which plaintiff called three witnesses and defendants presented five witnesses. Additionally, the trial involved several exhibits containing emails, letters, production and operations logs, and diagrams, pictures, and videos of the facility.

---

[1] The parties originally stipulated that the Relevant Period would run from June 10, 2012 to September 27, 2013. (Dkt. No. 116, Stipulated Fact 6.) However, in their trial briefs and during trial, the parties stipulated to modify such period to run instead from July 10, 2012 through September 27, 2013.

Having heard and carefully considered all of the evidence and argument presented at trial, and all briefings and stipulations, the Court hereby renders the following findings of fact and conclusions of law, resulting in its finding that plaintiff was properly classified as exempt during the Relevant Period.  Accordingly, the Court **RULES** in favor of defendants.

## I.    UNDISPUTED OVERVIEW

### A.    Undisputed Background

The following facts are largely undisputed:  Defendants hired plaintiff in 2005 to work at the Pyramid Brewery in Berkeley, California (the "Facility") as the "Production Manager."  (Dkt. No. 116, Stipulated Facts ("SF") 1, 2, and 5.)  On or around September 27, 2013, due to demand and quality issues, defendants suspended operations at the Facility, and ultimately permanently closed the same.  (*See* SF 4.)  On October 7, 2013, defendants laid off plaintiff.  (SF 5.)

At the Facility, the Production Manager oversaw the production, shipping & warehouse, and draft departments.  (SF 3.)  When plaintiff was initially hired, defendants provided him with an offer letter setting forth his duties as follows:  "1. Managing Inventories of all packaging raw materials in the plant[;] 2. Assuring quality of all finished goods plant wide[;] 3. Hiring, termination and supervision of direct reports[;] 4. Maintaining and building a strong team of direct reports that are trained and motivated to achieve objectives[;] 5. Accounting for all hours worked by direct and indirect reports[;] 6. Accounting for liquid and packaging material losses[;] 7. Responsible for weekly and month end inventories of all packaging materials[;] 8. Responsible for insuring we are compliant on all QA procedures and process[;] 9. Light maintenance of production line machinery."  (Defendants' Exhibit "DEX" 1001.)  Plaintiff claims that this description of his duties did not accurately reflect his day-to-day obligations during the Relevant Period because he was forced to spend the majority of his day acting as a machine operator for the production line.[2]

---

[2] Specifically, during redirect, plaintiff testified that he did not perform the duties listed as items (2), (3), (5), (6), and (8), and he was performing more than light maintenance during the Relevant Period.  (Trial Tr. 363:14–364:10.)  Additionally, he testified that he prepared fewer performance appraisals and signed fewer time-off requests during the same.  (*Id.* at 364:11–18.)

The parties submitted a summary showing the hours in which the production line was running during the Relevant Period. (DEX 1087 and Plaintiff's Exhibit ("PEX") 9.)[3] These exhibits are based on operation logs admitted into evidence as DEX 1083. The summaries demonstrate the following: The Relevant Period included 298 working weekdays plus six weekend days during which the Facility was operational. Of those 304 total days, the production line did not run for 152 days, which amounts to 50% of the total working days during the Relevant Period.[4] Importantly, on days where no production occurred, plaintiff asserts that he was still at the Facility for ten hours due to a mandatory 6:30 a.m. to 4:30 p.m. schedule, and on days when production was active, plaintiff added 1.5 hours to the total run time to account for clean-up time. Defendants dispute that plaintiff had a mandatory ten-hour schedule, and also dispute the addition of 1.5 hours to the total run time.[5]

Finally, the parties have stipulated that plaintiff's weekly salary during the Relevant Period was: (i) $1,238.52 from July 10, 2012 to June 18, 2013 and (ii) $1,263.29 from June 18, 2013 to September 27, 2013.[6]

---

[3] DEX 1087 represents a version of the exhibit prepared by defendants and sent to plaintiff for approval. PEX 9 represents a version of the exhibit annotated by plaintiff, including plaintiff's calculations of the times in which he was at work.

[4] Plaintiff acknowledged at trial that he mistakenly added ten hours to certain holidays during which he admittedly did not work. The Court shall not consider such hours in the context of its findings of fact and conclusions of law herein. Additionally, PEX 9 also reflects that plaintiff had taken nine personal days off during the Relevant Period.

[5] According to plaintiff, such cleaning process was automated and lasted 1.5 hours. Defendants contend that the end time on the operator logs accounted for the clean-up process. (*See, e.g.*, DEX 1083 (February 29, 2013, 5:30 p.m. production end time and 5:15 p.m. CIP end time).) However, defendants proffer no testimony explaining precisely what such description on the operator logs means. Defendant also argues that plaintiff's witness Powell testified that the cleaning procedure lasts at most sixty minutes and not the ninety minutes claimed by plaintiff. (*See* Trial Tr. 703:22–704:3 (Powell).)

[6] The parties have further stipulated that plaintiff's direct reports had the following hourly wages: (i) Trung Bui, $14.38; (ii) Leopoldo Martinez, $14.86; (iii) Maria Carillo, $15.60; (iv) Erick Campista, $15.82; (v) Carlos Sanchez, $16.33; (vi) Francisco Flores, $17.76; (vii) Marco Flores, $17.95; (viii) Keith Bright, $17.97; (ix) Jose Mora, $18.92; and (x) Dennis Tabbert, $25.57.

### B.  Undisputed Overview of Facility Operations

The Facility essentially consisted of two operations, namely the brewery and production departments.  The production department was composed of the production line (for bottling beers), the draft line (for filling kegs), and warehouse & shipping.  Additionally, the maintenance department provided support for both the brewery and production departments.  Although the number of employees fluctuated during the Relevant Period, the production department employed approximately eleven individuals, the brewery approximately ten, and maintenance approximately three.  The following "managed" each department during the Relevant Period:  (i) Production (Victor Boyce for the entire period); (ii) Brewery (Simon Pesch and then John Chamberlain); and (iii) Maintenance (Kevin Gray from 2005 through November 29, 2012; Layne Powell from December 21, 2012 through the end of the Relevant Period).  Each manager, in turn, reported to the Plant Manager.  Eduardo Perez was Plant Manager from the beginning of the Relevant Period through approximately May 2013, and Norm Wolfe was Plant Manager from approximately May 2013 through the end of the Relevant Period.

Generally, the Facility functioned thus:  The brewery side of the operations produced the actual beer.  The finished beer would then be placed in large containers called Brite Tanks.  The production department would then extract the beer from the Brite Tanks and send it either to the production line or the draft line.  Once the product had either been bottled or placed in a keg, a forklift operator would then take the product to the warehouse to await shipment.

The schedule followed to produce the beer and then package for shipping was set generally by Marlis Sears, the Supply Chain Coordinator, who was based in Portland, Oregon.  Essentially, Sears would receive an order for a specific product, and she would set it on a schedule to be shipped in approximately four weeks.  (Trial Tr. 808:25–809:6; *see generally* DEX 1085.)  Based on that schedule, she would ensure that the brewery out of which that product would be manufactured possessed the necessary ingredients and materials.  (Trial Tr. 809:9–15.)  The production schedules Sears prepared would be sent to Perez, Pesch, and plaintiff.  (*Id.* at 810:24–811:1.)  Sears testified that the production department decided the order within any day's schedule, and she was primarily concerned with ensuring that the customer's order was filled.  (*Id.*

at 812:9–13.)  If issues arose in the production line that would impact the schedule, Sears testified that plaintiff would inform her of the same so she could adjust schedules accordingly.  (*Id.* at 815:21–816:20.)

The crux of plaintiff's claim is that he spent most of his hours operating machines on the production line to provide mandatory rest and lunch breaks for the line operators.  Thus, it is important here to discuss the process by which the beer was bottled, packaged, and sent to the warehouse for shipping.  The production line required approximately five people for the following positions:  (1) filler and labeler; (2) drop packer; (3) palletizer; (4) box erector and six-packer; and (5) backend forklift operator.  The first position, the filler, was the initial person to arrive in the morning for the production line.  Generally, the filler would check the white board next to the Brite tanks to determine what product needed to be produced for that day.  The filler would then proceed with running certain sanitation tests and procedures before beginning the process of running beer through the machines.  At the Facility, the filler also ran the labeling machine.  (Trial Tr. 19:21–21:7.)  The third position was the "drop packer," where the bottles are placed in boxes.  (*Id.* at 21:8–11; 23:9–13.)  The next position was the "palletizer," which rotates the box according to a certain pallet to prepare it for shipping.  (*Id.* at 23:14–22.)  The final position on the production line was the "box erector and six-packer."  (*See* DEX 8 at 2–3.)  After the process was completed, a forklift operator would then take the finished pallet and move the product to the warehouse.  (Trial Tr. at 24:2–4.)[7]

## II.    OVERVIEW OF ISSUES TO RESOLVE

The parties do not dispute the standard against which the controverted facts must be weighed.  The Court reviews it here:

The FLSA requires employers to provide overtime compensation for employees for hours worked above forty hours a week unless a particular exemption applies.  29 U.S.C. § 207(a)(1);

---

[7]  Layne Powell confirmed that, at minimum, the line required four or five people to operate properly.  (Trial Tr. 770:13–16 ("There—there would be, I think I said five to six.  But it could be four to five.  If you really—if you didn't have enough people, you may be able to run the line with four to five people.").)

1  *see Solis v. Washington*, 656 F.3d 1079, 1083 (9th Cir. 2011). "FLSA exemptions are to be

2  'narrowly construed against . . . employers' and are to be withheld except as to persons 'plainly

3  and unmistakably within their terms and spirit.'" *Solis*, 656 F.3d at 1083 (quoting *Auer v.*

4  *Robbins*, 519 U.S. 452, 462 (1997). The employer has the burden of demonstrating, by a

5  preponderance of the evidence, that an exemption applies to any particular employee. *Id.* ("The

6  criteria provided by regulations are absolute and the employer must prove that any particular

7  employee meets every requirement before the employee will be deprived of the protection of the

8  Act." (citations omitted)); *see also Duff-Brown v. City & Cty. of San Francisco*, No. 11-CV-3917-

9  TEH, 2013 WL 163530, at *4 (N.D. Cal. Jan. 15, 2013) (finding that defendant's burden in an

10  FLSA classification case is the preponderance standard).

11       Thus, the entire case revolves around whether defendants have demonstrated by a

12  preponderance of the evidence that plaintiff's work during the Relevant Period fell within an

13  FLSA exemption, namely the executive employee exemption. To resolve that issue, the Court

14  considered all of the documentary evidence and the testimony proffered, including weighing the

15  relative credibility of the witnesses on the topics to which they testified. To that end, the Court

16  identifies the witnesses called to testify and comments generally on their credibility and

17  reliability:[8]

18  **1) Plaintiff Victor Boyce**: Plaintiff's testimony regarding his day-to-day
    activities is the most comprehensive source of information about daily tasks and
19  duties. However, plaintiff's testimony lacked specificity as to the timing of
    certain events, and, at times, his testimony revealed critical flaws in his memory
20  regarding timing and frequency of significant events. For instance, he testified
    about an incident that he explains occurred as a result of certain workforce
21  reductions. (Trial Tr. 131:1–14.) However, on cross-examination, he conceded
    that such incident likely occurred in 2003, prior even to his being hired as Plant
22  Manager. (*Id.* at 212:8–12.) Similarly, certain extensive maintenance work
    occurred well before the Relevant Period.
23

24  **2) Kenneth Yartz**: Yartz oversaw the Facility at Berkeley as the Vice President
    of Operations from the beginning of the Relevant Period until January 2013.
25  Yartz was based out of Rochester, New York and visited the Facility only once in

26

27      [8] Defendants also called Ryan Erickson, the Production Manager at the Portland Brewery.
28  However, the Court does not find any of Mr. Erickson's testimony to be relevant to the issues in
    this action, and as such, his evidence bears no weight on the Court's analysis.

this capacity during the Relevant Period. Thus, although the Court finds Yartz' testimony to be credible, Yartz had only limited opportunity to observe personally the daily activities at the Facility. Additionally, although Yartz testified that he had weekly calls with the managers at the Facility, no record exists of who was on such calls on a weekly basis. The probative value of this testimony was weak.

**3) Mark House**: House succeeded Yartz in overseeing the Facility from January 2013 through the end of the Relevant Period. House was also based out of Rochester, New York, and visited the Facility periodically throughout the Relevant Period. During the trial a dispute arose as to how often House was on the premises during the Relevant Period. The Court only credits defendants' responses to interrogatories in its findings of fact and conclusions of law. Due to the contradictory nature of House's testimony and the lack of any business records to substantiate House's version of his visits to the Facility, the Court finds his testimony to be uncredible.

**4) Joellen Grady**: Grady served as the Human Resources Coordinator through the Relevant Period, and was based out of the Facility in Berkeley. The Court finds that Grady's testimony on the subjects upon which she was familiar to be credible. However, she also lacked detailed personal knowledge of plaintiff's day-to-day activities at the Facility making her less probative on those issues.

**5) Layne Powell**: Powell served as the Maintenance Manager from December 2012 through the end of the Relevant Period. The Court finds Powell's testimony and memory of events credible.

**6) Kevin Gray**: Kevin Gray was the Maintenance Manager from 2005 through November 2012. In this role, Gray worked with plaintiff on almost a daily basis and corroborated much of plaintiff's testimony. However, like plaintiff, Gray's testimony demonstrates a lack of memory as to the timing of certain events and the specific details of plaintiff's work. Further, the Court notes a certain amount of bias as he too sued defendants on the same basis.

**7) Marlis Sears**: Sears was the Supply Chain Coordinator throughout the Relevant Period, and was based in Portland, Oregon. Sears visited the Facility approximately once a month. The Court finds Sears' testimony credible, but also notes that she had limited exposure to plaintiff's daily activities at the Facility.

The Court is well-aware that each side has a self-interest in the outcome of this case. For this reason the Court has searched for corroborating evidence. Notably, neither side called as witnesses the most knowledgeable third parties, namely either Eduardo Perez or any of the employees whom plaintiff either "managed" or worked alongside.

Much of plaintiff's case hinged on the argument that Plant Manager Perez's micro-management style prevented plaintiff from serving as a "true" manager. Given that Perez was not employed for four of the fourteen-month Relevant Period, plaintiff's strongest case does not apply to over twenty-five percent of the Relevant Period. Further, while the Court reviews each of the

factors under the law which evidence managerial roles, these factors are less helpful where, as here, plaintiff was supervising a seasoned team of employees during a slow-down period.

Against this backdrop and in light of all the record evidence, the Court makes the following findings of fact regarding plaintiff's job duties during the Relevant Period organized into nine separate categories.

## III. FINDINGS OF FACT

### A. First Category: Time Spent on the Production Line

The Court finds that until approximately April 2013, plaintiff did not regularly cover as a machine operator absent extenuating circumstances such as simultaneous absences.[9] From April 2013 through the end of the Relevant Period, the production line was often shut down because of declining demand and quality issues. (*See* PEX 9.) Moreover, between April 2013 through the second half of May 2013, the Facility operated on a 32-hour week schedule because of declining demand. (*See* Trial Tr. 512:2–7.)[10] This Category does not support a finding of misclassification.

The Court's finding is based in part on the following:

Plaintiff testified that he spent about six to eight hours operating machines on days when production was running. The evidence in the record partially corroborates plaintiff's testimony. Both Powell and Gray testified that Perez instructed them to relieve hourly employees for breaks.

---

[9] (*See* Trial Tr. 726:14–26 (Powell testifying that the layoffs during Relevant Period "made it far more difficult for runs to be complete, which is why Victor and myself were on the floor relieving for breaks and lunches"); *id.* at 755:17–23 (Powell testifying that Tabbert was still production lead and able to fill in on the line in early 2013).)

[10] Also in dispute is whether plaintiff could continue to manage while working on the production line. Plaintiff proffered evidence suggesting that it was nearly impossible to communicate while operating the machines because of the noise levels around the production line and because operating the machines required extreme focus. (Trial Tr. 129:15–24 (Boyce); 707:4–708:6 (Powell); 655:16–656:15 (Gray).) However, plaintiff himself concedes that he was able to stop the machine or walk away when necessary: "Q: Okay. During the relevant period, did you ever have personal face-to-face meetings or conversations with Joellen Grady? A: Yes. Q: Would those be in her office or on the production floor? A: They could be in—generally never in her office. So she would either come into the brewery, and if I was in the office area, she'd talk to me there. If I wasn't, she would actually come up to the machine if I was running it and talk to me there. Q: She could talk to you while you were running a machine? A: I would stop it or walk away or it was between a break or breakdown or something." (*Id.* at 47:4–16.)

8

(Trial Tr. 705:13–706:10 (Powell); 620:2–621:2 (Gray).)  In a May 13, 2013 email, Eduardo Perez asked Mark House when they would be able to backfill the recently eliminated positions because the "salary guys are spending more than 60% of the day out on the floor."  (PEX 8 at 2; *see also* PEX 10 (May 24, 2013 Email from Perez) at 1 ("The direction was given by Mark House to utilize maintenance staff (Layne Powell) as machine operators . . . Victor will operate the box erector and six pack erector as usual.  Layne Powell will rotate breaks and lunches; this should take up most of his day."); DEX 1016 (June 2013 Appraisal Report) ("[Boyce's] roll [sic] as the production manager continues to be a busy one.  He is needed out on the floor for most of the day so he does a good job powering through his paperwork in order to get out on the floor and does it with a positive attitude.").)  Additionally, several witnesses testified to seeing plaintiff operating machines.  (*See* Trial Tr. 618:2–22 (Gray); 704:18–705:17 (Powell).)  A contemporaneous email from plaintiff indicates difficulty in scheduling manager phone conferences because of his obligations related to operating the machines.  (*See* DEX 1102a (June 21, 2013 Email) ("Mark, would it be possible to move the meeting up to 9am just because that's pretty much the only window I have before rotating out breaks and lunches I'm usually running the filler by at least 9:45.").)

However, the evidence also demonstrates that plaintiff would have had little to no occasion to fill in as a line operator during the Relevant Period because either the line was not running or staffing was otherwise sufficient.  First, PEX 9 shows that for approximately 50% of the days during the Relevant Period, no production was occurring and therefore the production line was not operational.[11]  Significantly, recalls of the product occurred in late 2012, and the Facility ceased operations for much of April 2013 to May 2013 and again in September 2013.

---

[11]  Plaintiff also proffered evidence that he often worked on "repack projects."  Essentially, repack projects involved employees taking out bottles of beer that had previously been packaged and manually separate them into variety packs for sale at Costco.  These repack projects were sometimes performed during the weekend or during the weekdays.  Plaintiff argues that these repack projects may have occurred on days where the operator's logs showed no production.  However, plaintiff includes no citations to the record explaining why such projects would not have been reflected in the operator's logs.  In any event, plaintiff does not proffer any evidence that any such unaccounted for repack projects occurred frequently enough to affect the Court's analysis herein.  To the contrary, plaintiff's witness Layne Powell testified that the frequency of repacks

Second, for much of the Relevant Period, sufficient staffing existed to cover the production line and still have another employee fill-in during the breaks.  At the beginning of the Relevant Period, plaintiff supervised the following individuals:  (i) Trung Bui (production line operator); (ii) Leopoldo Martinez (draft line operator); (iii) Maria Carillo (production line operator/forklift driver); (iv) Erick Campista (production line operator); (v) Carlos Sanchez (forklift driver); (vi) Francisco Flores (production/draft line operator); (vii) Marco Flores (production/draft line operator); (viii) Keith Bright (line operator/drop packer); (ix) Jose Mora (lead warehouse employee/forklift driver); and (x) Dennis Tabbert (production line supervisor).  (SFs 9–19; *see also* Trial Tr. 922:23–926:16 (Grady).)  The production line only required approximately five machine operators to run, and with a full contingent, Dennis Tabbert was free to provide breaks to the machine operators.  (*See* Trial Tr. 755:17–23) (Powell testifying that Tabbert was still production lead and able to fill in on the line in early 2013.)  Additionally, Kevin Gray and Layne Powell as well as Eduardo Perez sometimes provided breaks to the line operators.

The reductions in staff for plaintiff's department began occurring in earnest in February 2013 when Erick Campista was transferred to the brewing department.  (*Id.* at 925:15–17.) Following that transfer, Leo Martinez was then laid off in April 2013 due to a decline in production.  (*Id.* at 925:18–19.)[12]  In May 2013, defendants provided Carlos Fairbank medical leave for three weeks and Marco Flores paternity leave for approximately eight weeks.  (*Id.* at 924:16–925:7.)  After Carlos Fairbank went on medical leave, the Facility hired a temporary employee to cover in the production department.  (*See id.* at 926:18–21.)[13]

---

varied, and may occur once a month or once every other month.  (Trial Tr. at 712:22–24.) Additionally, the evidence demonstrates that temporary employees were generally used to staff the repack projects, and such projects required only certain machines.  (*See id.* at 631:2–632:16 (Gray).)

[12]  In fact, according to the operation logs as reflected in PEX 9, production was only operational for five days in April.  (PEX 9, April 1, 2013–April 30, 2013.)

[13]  Evidence in the record also suggests that plaintiff may not have always provided the necessary breaks and lunches to his subordinates.  Following the shutdown of the Facility in 2013, each of plaintiff's subordinates filed claims against defendants for missed meal and rest breaks during the Relevant Period.  (Trial Tr. 899:17–24 (Grady).)  Defendants ultimately settled these

Such evidence sufficiently rebuts plaintiff's faulty memory and testimony regarding the amount of time he spent on the production line throughout the Relevant Period. While it may be true that for some parts of the Relevant Period, plaintiff had to spend significant amounts of time on the production line, the evidence does not support plaintiff's testimony that such was true for the majority of, let alone the entirety of, the Relevant Period. To the contrary, the Court finds that plaintiff's testimony regarding his time spent on the production line is properly limited only to a short window of time around May 2013.

### B. Second Category: Hiring, Suspending, and Terminating Temporary or Permanent Employees

The Court finds that plaintiff had a role in hiring employees, albeit minimal. Given the lack of much activity on this front, this Category does not weigh heavily in the Court's analysis but ultimately supports a management classification.

With respect to the hiring of permanent employees, plaintiff testified that during the Relevant Period he did not hire or fire any employees, nor did he have the authority to do so. (Trial Tr. 88:11–16; 196:12–14.) The record demonstrates one occasion in which Grady informs plaintiff that House had approved hiring another full time line operator. (DEX 1099 (February 14, 2013 Email).) Plaintiff's response was to continue using a temporary employee (on staff for a few months) rather than hire someone else, so that plaintiff could evaluate the temporary employee's work ethic and reliability. (*Id.*) This temporary employee was ultimately not hired full-time.[14]

With respect to hiring of temporary employees, several documents demonstrate that plaintiff communicated directly with temp agencies for projects in his department. (*See generally* DEX 1095.) For a period in May 2013, plaintiff had to process requests through Grady, who then communicated with the agency. (*See id.* (May 31, 2013 Email Chains).) However, House determined that he only wanted Human Resources to identify the agency for cost control purposes,

---

claims after reviewing timecards, which reflected lunch breaks but not rest breaks. (*Id.* at 899:24–901:4, 930:15–932:24.)

[14] Plaintiff was also involved in decisions surrounding two positions outside of his department: (1) the lead brewer and (2) a safety proctor. (Trial Tr. 881:1–882:7.)

United States District Court
Northern District of California

but decided that it would be more efficient for the Facility departments to communicate with the agencies directly for hiring. (*Id.* ("Mark has given approval for you [Boyce] and Dennis to resume ordering temps directly through the agency as you know the specific needs of the department.").) Plaintiff testified, however, that Perez would instruct him as to how many temporary employees to request. (Trial Tr. 390:9–12.) Additionally, plaintiff testified that Dennis Tabbert, one of his subordinates, was actually in charge of communicating with the agencies and managing the temporary employees. (*Id.* at 303:12–304:4, 398:8–20.)

The emails in the record demonstrate that plaintiff played an active role in managing the relationship with the temp agencies throughout the Relevant Period. (DEX 1095 (January 30, 2013 Email) ("I just wanted to give you the opportunity to see if you can get this corrected if not I will be looking to work with another agency as our schedule/demand is tight and I must produce what's on my schedule and without the people I can't fill my numbers."); *see id.* (September 6, 2013 Email from Agency to Boyce only) ("I am happy to say that we can match the $13.70 bill rate of your current agency.").) Thus, plaintiff was central to hiring decisions even if he did not ultimately hire or fire anyone in the Relevant Period. This Category does not support a finding of misclassification.

### C.     Third Category: Involvement in Disciplining Employees

Plaintiff did have a role in disciplining employees, again albeit minimal. Because of the lack of any activity on this front, this Category does not weigh heavily in the Court's analysis but ultimately supports a management classification.

The record evidence demonstrates that plaintiff was involved in disciplining his subordinates both during and before the Relevant Period. (*See, e.g.*, DEX 1039 & 1068.) For instance, on October 24, 2012, plaintiff issued a written warning to Dennis Tabbert, noting the following: "The safety glass on the drop packer has not been in place for approximately two weeks. I have asked Dennis to replace it several times, the last being Tuesday October 16th during repack, but it has not been done. This is not the only incident where I have asked Dennis to do something and he does not get it done. The missing safety glass on the drop packer results in not only a safety hazard, but a noise hazard as it is designed to be a noise-cancellation device. We

had a noise study performed today and the inspector pointed out the missing guard/noise-cancellation glass." (DEX 1039.) Plaintiff also noted that he had prior verbal discussions with Tabbert regarding this issue. (*Id.*)

Plaintiff's testimony to the contrary, namely that he did not have the authority to discipline any employees without approval from Perez or Grady, does not persuade. (Trial Tr. 90:3–23; *see also id.* 725:20–726:4 (Powell confirming that disciplinary actions needed approval).) Plaintiff testified that if he had a certain issue with any particular employee, he would raise the issue with Grady or Perez. (*Id.* at 89:14–90:4.) That he had to collaborate does not undermine his admitted authority to recommend discipline. (*See Id.* at 750:17–20 (Powell).) Further, he was the only person with personal knowledge to comment on disciplinary issues during the review periods. Finally, once Perez was fired, and before Wolfe was hired as Plant Manager, no one else led that department. Although the evidence is unclear as to the length of the gap between such events, the record demonstrates that at least for some period of time, the Facility had no active Plant Manager and no one other than plaintiff served as the lead manager.

This Category does not support a finding of misclassification.

### D.     Fourth Category:  Staffing Management

The Court finds that this Category weighs in favor of plaintiff. Although plaintiff had some involvement in suggesting schedules, his managerial role in the same was significantly limited by Perez's involvement in such decisions. This changed after Perez was terminated. As to that time period, the evidence demonstrates that Wolfe, who replaced Perez, was not as hands-on and did not focus his time or attention on the production department. The Court's finding in this regard is based on the following evidence:

With regard to hours worked by his subordinates, plaintiff testified that he did not adjust the same. All scheduling decisions, according to plaintiff, had to be funneled through Perez for any of the employees within the Production department. (*Id.* at 94:3–7.) Some evidence demonstrates that plaintiff played some role in recommending general schedules to upper management. For instance, in an April 11, 2013 email to Mark House, plaintiff emailed House, copying Perez and Pesch, a draft shipping schedule allotting the 11:00 a.m. to 12:00 p.m. time slot

for "LUNCH." (DEX 1102 (April 11, 2013 Email).) With regard to requests for time off, plaintiff concedes that he reviewed and signed off on requests for time off as part of his managerial duties both during and prior to the Relevant Period. (*Id.* at 263:9–11; *see also* DEX 1023.) However, plaintiff testified that such was essentially pro forma as Perez had already made the decision to provide such employee with leave. (*Id.* at 401:1–12.)

Plaintiff's testimony regarding his lack of managerial capacity with respect to staffing is based on Perez's micromanagement style. As discussed previously, Perez was terminated around May 2013, and was replaced by Wolfe, who, by contrast, was not as focused on production but on other issues. (*See id.* at 64:17–21 (Boyce) ("Eduardo was more hands-on, he was very aggressive. Norm—Norm was kind of kept to himself and—and had other agendas going on at the time. And Eduardo was more focused on the—on the production department than he was with any other part of the brewery."); *see also id.* at 580:4–9 (House) ("Q: And then did you give the new plant manager direction about how to manage the facility? A: Yes. At—at that time, we were mainly focused on trying to get the quality issue taken care of, and so that was—you know, that was one of his biggest focuses.").) Accordingly, the Court's finding in favor of plaintiff with regard to this Category is limited only to the period during which Perez was the Plant Manager.

### E.      Fifth Category: Salary Recommendations and Performance Reviews

While limited, the evidence demonstrates that plaintiff had a managerial role in recommending salary increases and conducting performance reviews and assessments for his subordinates during the Relevant Period. Given the lack of activity during the Relevant Period as to these issues, the Court's finding on the same bears little weight in its overall analysis.

With regard to setting pay rates, plaintiff was involved once during the Relevant Period in recommending pay increases for his subordinates. In response to a request from Eduardo Perez asking how much each manager is recommending in pay increases from 0–3%, plaintiff responded with his recommendations and reasons why he thought each of his subordinates should receive that raise. (DEX 1093 (May 20, 2013 Email 10:27 PM).) Plaintiff testified, however, that he never provided input on this issue *sua sponte*.

Additionally, plaintiff testified that during the Relevant Period, his involvement in conducting performance reviews of his subordinates was significantly reduced because he had no time to do so. (Trial Tr. 266:15-24, 364:11–18.) Some evidence suggests that performance reviews were occurring around April 2013, but the results of such review are not in the record. (*See id.* at 893:8–23 (Grady).) However, near the end of the Relevant Period, plaintiff responded to an email from Wolfe asking plaintiff to evaluate each of his subordinates. In plaintiff's response, he details the strengths and weaknesses of many of the employees whom he supervised. (DEX 1093 (September 3, 2013 Email).) Again, plaintiff readily provided such information given his role and knowledge.

This Category does not support a finding of misclassification.

## F. Sixth Category: Training and Safety

Plaintiff's subordinates were all seasoned veterans of their respective positions. The evidence demonstrates that there was limited need for training during the Relevant Period. However, the Court finds that a central component of plaintiff's duties was to ensure that safety procedures were followed and to identify potential issues that could arise that would impact safety on the production line. Thus, based on the following evidence, the Court finds that this Category weighs in favor of defendants.

Plaintiff testified that during the Relevant Period, he did not train any employees. (Trial Tr. 97:19–2, 103:11–12, 106:7–13.) Specifically, plaintiff testified that he did not need to conduct trainings for the line operators or other employees because they had been there for many years and therefore needed no training. (*Id.* at 95:10–23; *see also id.* at 621:20–24 (Gray); DEX 1016 at 357 ("The packaging department has very little turnover. Most all operators can operate more than two machines.").) Plaintiff testified thus: "Most of the employees were already there before I was there so they would already have been trained and they had been running the same machinery for the same amount of years from before the time I got there to the time I left." (Trial Tr. 215:18–21; *id.* at 215:10–13 (agreeing that there was "very little turnover" in his department during his tenure at the Facility).)

Plaintiff also testified, however, that maintaining the safety of his subordinates was an important part of his day-to-day duties: "Q: And [safety is] an important part of your job each and every day you're in the plant; isn't that right? A: Yes. Q: And if you, as a manger, would see someone who was acting in an unsafe manner, would it be true that you would go to that person and correct them? A: Most likely. Q: That would be your job responsibility, wouldn't it? A: Yes." (*Id.* at 188:12–21.) Additionally, plaintiff's self-assessment in February 2011 also demonstrates that plaintiff's time spent on the floor either observing or working the machines was, in part, to determine safety loopholes and correct them. (DEX 1011 (February 24, 2011 Appraisal Report) ("I try to get out on the floor at times and just look around while thinking of safety even though at times its [sic] hard to do with the regular business needing to be done, but just thinking of safety while your [sic] walking around gives you the opportunity to see things. I also believe actually having the opportunity to run some of the machines on a daily basis gives me the opportunity to see things you wouldn't being in the office and people are willing to share things with you since they see you doing the same work as them."); *see also* DEX 1013 (February 2012 Report) ("I try my best to lead by example. You can find me actually working the floor with the line operators throughout the week. I believe they have a higher respect and feel appreciated seeing a manager doing the same job as them. It also allows them time to talk and point things out to me as I'm there in the moment on the floor where the action is happening.").) Furthermore, as discussed above, plaintiff was involved in disciplining his subordinates for safety-related issues. (*See supra.*) That plaintiff's actions resulted in a safe work environment does not mean that he was not misclassified. To the contrary, his approach supports the finding that he was not misclassified.

### G.     Seventh Category: Maintenance Work

The Court finds that plaintiff's performance of maintenance work does not weigh in favor of finding that he was misclassified. Neither plaintiff's testimony nor that of the other witnesses persuades otherwise.

Plaintiff testified that he was required to perform maintenance work, and admits that his offer letter included the same. Specifically, he testified that he was required to clean and rebuild

valves on the bottling line.  (Trial Tr. 109:14–110:20.)  Additionally, he also assisted with changing light bulbs, pouring concrete, patching holes, and re-painting the building.  (*Id.* at 144:24–145:9, 146:1–6, 346:12–347:1.)  Plaintiff's witness Kevin Gray corroborates plaintiff's testimony in this regard.  (*See id.* at 659:6–660:5 (Gray).)  However, some of this work qualifies as "light maintenance" while the more major projects preceded the Relevant Period.

Notably, plaintiff called another maintenance manager, Layne Powell, who testified thus:

Q:  Did Mr. Boyce ever assist you with maintenance, any of your maintenance work?

A:  I can think of at least one time when he did.

Q:  Do you know or do you recall observing Mr. Boyce performing other kind of more routine maintenance?

A:  No.

Q:  No.  You don't—you didn't observe him doing others, or he did not?

A:  There was no reason for him to do maintenance.

(*Id.* at 693:24–694:9, 723:21–724:5.)  Powell explained that plaintiff would submit maintenance requests for the production department to a central database system for the maintenance department to address.  (*Id.* at 767:12–21.)

This Category does not support a finding of misclassification.

**H.    Other Managerial Duties**

Other trial evidence corroborates a finding that plaintiff was properly classified as exempt. Specifically:

With respect to workforce reductions, plaintiff testified he spent more time operating machines which precluded him from performing other managerial duties, such as inspecting the machines or analyzing the quality of the bottles being produced.  (Trial Tr. 202:11–203:1.)  Yet, in a September 3, 2013 email to Norm Wolfe, plaintiff listed "quality checks" as one of his day-to-day roles, in addition to "overview of shipping, packaging, and draft line," "receiving and inventory's [sic] of dry and full goods," "ordering things if necessary," and "attending meetings and giving updates."  (DEX 1093 (September 3, 2013 email).)  Plaintiff testified that part of his

job duties was to ensure compliance with government regulations regarding the cleaning and packaging of the products. (Trial Tr. 351:15–25.)[15]

Next, with respect to materials procurement, plaintiff testified that he played no part in determining the materials bought or sold. Yet, he admitted that he was responsible for notifying Sears and/or Perez of any issues relating to the lack of materials necessary for production (*id.*at 121:16-24) or delays or disruptions in the operations that would require the schedule to be modified (*id.* 815:8–816:20 (Sears); *see also* DEX 1102 (October 4, 2012 Email).) Furthermore, plaintiff was responsible for ensuring that the production line functioned efficiently, and he testified that Perez reprimanded him whenever there were deficiencies. (Trial Tr. 122:11–14.) In other words, plaintiff's supervisory role over the production line was integral to the continued and efficient functioning of the Facility's operations.

## I.     Other Non-Managerial Duties

The Court finds that plaintiff's uncontroverted testimony with regard to other non-managerial duties weighs in favor of plaintiff's case. However, given the lack of specificity as to the amount of time plaintiff spent on such activities, the Court does not consider such testimony as significantly probative in its analysis.

In addition to providing breaks to employees on the production line, plaintiff testified that he also provided breaks to employees in the shipping department and in the draft line. (Trial Tr. 28:23–29:7, 125:9–17, 126:15–18.) On days when the lead shipping employee was absent, plaintiff testified that he would often take over his duties for the entire day. (*Id.* at 139:14–25.) Other employees also witnessed plaintiff assisting the shipping department by driving the forklift, delivering paperwork, and loading and unloading trucks. (*Id.* at 621:5–19 (Gray); 710:10–21 (Powell).) Finally, plaintiff also testified that the Facility did not have a janitor, and he oftentimes performed several janitorial jobs. (*Id.* at 143:9–22.)

---

[15] Relying on Yartz's testimony, defendants argue that plaintiff participated in weekly calls with corporate management that lasted approximately thirty minutes to discuss management at the Facility, including its finances. (Trial Tr. 434:1–15, 441:19–442:4.) However, as defendants concede, Yartz could not confirm on how many of these calls plaintiff was present.

## J.     Other Issues

**Mandatory Schedule:**  Plaintiff testified that throughout the Relevant Period he had a mandatory schedule which ran from 6:30 a.m. to 4:30 p.m.  On days when the production line was running, plaintiff had to stay through to the end of production.  (*Id.* at 152:12–21 (Boyce); *see also id.* at 626:17–628:18 (Gray).)  On days when there was no production, or when production ended before 4:30 p.m., plaintiff testified that he still had to remain at the Facility until 4:30 p.m.  (*Id.* at 344:1–22.)

An email from plaintiff to Norm Wolfe on September 3, 2013, however, indicates that plaintiff viewed his daily schedule as running from 6:30 a.m. to 3:00 p.m.  (*See* DEX 1093 (September 3, 2013 Email).)  Moreover, when asked during cross-examination whether such a mandatory 4:30 p.m. end time was in place during the Relevant Period, plaintiff responded that he could not remember.  (Trial Tr. 344:13–14.)  Plaintiff proffered no other contemporaneous documents suggesting that he had, or believed that he had, a mandatory 4:30 p.m. end time.

This evidence was also necessary for purposes of any potential damages analysis but does not support a finding of misclassification.

**Relationship with Plant Manager:**  Most compelling, plaintiff testified that Perez, who was the Plant Manager from the beginning of the Relevant Period through May or June 2013 was a very aggressive micromanager.  (*See also* Trial Tr. 723:15–17 (Powell); 439:3–8 (Yartz); 571:14–22 (House).)  Plaintiff testified that he was such a micromanager that he controlled "every dollar spent in the—in the brewery, every hour of labor worked."  (*Id.* at 150:16–22.)  However, the evidence also demonstrates that Perez's physical presence varied from that of plaintiff.  The record shows that Perez generally arrived at the Facility by approximately 8:00 a.m.  (*Id.* at 180:22–25.)  Plaintiff, in fact, was uncertain as to what time Perez would leave the Facility, testifying that Perez would only "sometimes" remain until after production ended.  (*Id.* at 181:1–4.)  Powell also testified that Perez spent most of his day in his office, and was only occasionally out on the floor.  (*Id.* at 723:11–14, 752:7–11.)  In any event, Perez was not the Plant Manager for the entire Relevant Period.  Around May or June 2013, Perez was replaced by Norm Wolfe, whom the witnesses described as less hands-on with respect to the production line.  (*See id.* at 64:17–25.)

While the Court is persuaded that Perez micromanaged plaintiff, it is also clear that Perez relied on plaintiff to run and manage the production line.

## IV. CONCLUSIONS OF LAW

### A. Applicable Legal Framework

As discussed above, defendants have the burden of demonstrating that plaintiff's work during the Relevant Period satisfies the requirements for an FLSA exemption to the general overtime pay requirements. The FLSA includes an exemption from the overtime requirement for "any employee employed in a bona fide executive, administrative, or professional capacity . . . ." 29 U.S.C. § 213(a)(1). Here, defendants assert that plaintiff was employed as a "bona fide executive" and, therefore, was not entitled to overtime during the Relevant Period. To qualify for the "bona fide executive" exemption, an employer must show that: (i) the employee was compensated on a salary basis at a rate of not less than $455 per week; (ii) the employee's "primary duty" was "management" of the "enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; and that the employee (iii) customarily and regularly directed the work of two or more other employees and (iv) had the authority to hire or fire other employees or whose suggestions or recommendations as to the same were given "particular weight." 29 C.F.R. § 541.100(a). At issue here are the second and fourth factors of the test for a "bona fide executive" employee.[16]

**Primary Duty Is Management:** The term "primary duty" means the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as whole." *Id.* The regulations provide the following non-exclusive factors in determining whether an employee's primary duty is

---

[16] Plaintiff does not contest that he was compensated on a salary basis at a rate of not less than $455 per week. In plaintiff's post trial brief, he vaguely argues that defendants fail to satisfy the third factor because plaintiff's subordinates had been employed by the brewery for many years, knew their assignments, and performed with little or no direction. (Dkt. No. 146 at 28.) That plaintiff's subordinates were efficient workers, however, does not negate plaintiff's supervisory role over them.

management:[17]  (i) the amount of time spent performing exempt work; (ii) the relative importance of exempt duties as compared with other types of duties; (iii) the employee's relative freedom from direct supervision; and (iv) the relationship between employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  29 C.F.R. 541.700(a), (b) (emphasizing that the regulations do not require "that exempt employees spend more than 50 percent of their time performing exempt work" and that such employees may still meet the primary duty requirement if "other factors support such a conclusion"); *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113–14 (9th Cir. 2001) (affirming summary judgment in favor of defendant where plaintiffs claimed they "spent ninety percent of their time on nonexempt tasks" because other factors weighed in favor of finding that the primary duty was still management).

**Hiring, Firing, and Recommending the Same:**  To qualify for the executive exemption, the employee must have authority to hire or fire other employee, or his suggestions and recommendations as to hiring, firing, advancement, promotion, or other change of status must be "given particular weight."  29 C.F.R. § 541.100(a)(4).  To determine whether an employee's suggestions and recommendations are given particular weight, courts consider the following non-exclusive factors:  (i) whether it is part of the employee's job duties; (ii) the frequency with which such suggestions and recommendations are made; and (iii) the frequency with which the employee's suggestions and recommendations are relied upon.  29 C.F.R. § 541.105.  "An employee's suggestions and recommendations may still be deemed to have 'particular weight'

---

[17]  The regulations define "management" thus:  "Generally, 'management' includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures."  29 C.F.R. § 541.102.

even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.*

### B. Discussion

#### 1. Classification as Exempt under the FLSA

##### *a. Primary Duty as Management*

###### i. <u>Time Spent on Exempt and Non-Exempt Work</u>

Plaintiff's primary claim is based on his allegation that he spent the vast majority of his time covering for his employees on the production line or performing maintenance. However, as discussed above, the evidence in the record suggests otherwise.

First, and most persuasively, the operator's logs demonstrate that the production lines were not running for approximately 50% of the Relevant Period. Each week, there were usually a few days when production was not running and there were some weeks where there was no production at all. Thus, even crediting plaintiff's testimony that he spent approximately six hours each day that production was running to provide lunch and rest breaks, such would constitute less than 50% of plaintiff's work. Additionally, some evidence indicates that plaintiff's time on the floor involved, in part, managerial functions. (*See supra.*)

Second, as discussed above, for much of the Relevant Period, staffing was such that there would have been a sufficient number of employees to provide rest and lunch breaks. At least until April 2013 and May 2013 when plaintiff's numbers dropped from ten to six due to layoffs, transfers, and leaves, sufficient people were on the payroll to provide rest and meal breaks without plaintiff's intervention. Significantly, for much of April and May 2013, the production line was not running due to certain quality issues. The evidence demonstrates that for several weeks in May 2013, the Facility shifted to a 32-hour weekly schedule because of decreased demand.[18] This is not to say that the Court does not believe that plaintiff did in fact provide those breaks at times. Rather, that it was not primarily his task during the Relevant Period.

---

[18] Additionally, all of plaintiff's subordinates filed claims against defendants after the Facility was shut down claiming that they were not given the requisite rest and lunch breaks, undermining plaintiff's testimony that he did so daily. (*See supra.*)

Finally, plaintiff's claim that he performed maintenance tasks is belied by the testimony of his own witness, Layne Powell, who testified that plaintiff had no reason to do so.

Thus, the Court finds that this factor weighs in favor of finding that plaintiff was properly classified as exempt. *See Baldwin*, 266 F.3d at 1114–17 (granting summary judgment in favor of defendants even when plaintiff spent 90% on non-exempt duties).

ii.    Relative Importance of Employee's Exempt Duties

The evidence in the record also suggests that the performance of plaintiff's management duties was relatively more important than his performance of non-exempt duties.

First, plaintiff himself described his primary duty thus:

> Primary duty was—was making sure the line was—was getting started when I got there at, you know 6:00 or 6:30 a.m. Once I—I kind of saw everybody was there, then I would—I would go back to the filler machine, see what—see what was going on, if everything was okay as far as the liquid being ready and, you know, where he was in the process.

> Once I—I saw that, I would try to make it back to my office and go through my emails, see if there was any changes or—or anything I should know about before the—the day started. If I needed to reply to any emails, I would do so.

> I would then get the prior day's packet from the file in the—in the hallway by the offices. And that consisted of the operators' logs and the warehouse count and verification for product produced.

> I would then—I would then get that packet and I would email it to Marlis Sears so she could do data entry with that. Once that—once that was done, depending on what time that was, I would generally try to make it back out to the production floor before—before or a little after 7:00 to start my first break, breaking the—the filler operator out first since he was the first one in. And then after that first break, I would continue to do all the other five breaks. . . .

(Trial Tr. 79:10–82:4.) Thus, even in plaintiff's own words, his primary duty was to make sure that his subordinates were present on the line and to make sure that the production line was running. Plaintiff also testified that ensuring the safety of his subordinates' was an important part of his day-to-day activities. *See supra.* As part of this duty, plaintiff was responsible for ensuring that his subordinates were reprimanded and disciplined when necessary. Although plaintiff did not have authority to terminate or suspend any of his subordinates, he had the authority to issue verbal warnings and the authority to submit a report to human resources or the Plant Manager. In fact, Powell testified that the managers had a responsibility to do so. *See supra.*

Second, plaintiff's role in communicating with Sears, Perez, and maintenance regarding the functioning of the line was crucial to the enterprise's success. Plaintiff had to maintain an active line of communication with Sears to apprise her of any difficulties so that she could reorganize the schedule accordingly. Plaintiff also had to submit maintenance requests whenever there was a breakdown in machinery. In short, plaintiff's role in communicating and coordinating the needs and capabilities of the production line was necessary for the operation to function effectively.

By contrast, the evidence demonstrates that defendants did not expect plaintiff to be devoting a significant portion of his time to the performance of non-exempt duties. (Trial Tr. 478:13–18 (Yartz) ("Q: So do you have an understanding one way or the other whether Mr. Boyce was, in fact, being used by Mr. Perez in that capacity? A: During the relevant period, while I was responsible for it, I—I do not have that recollection, nor would I have expected it."); *id.* at 552:18–22 (House) ("Q: Is it true that Victor Boyce was assigned to fill in on the bottling line so the hourly employees could take meal and rest breaks? A: No. We had a lead that did that, you know, that would give meal and rest breaks.").) Importantly, plaintiff had the capacity to, and often did, hire temporary workers from agencies to cover as machine operators or forklift operators. The emails submitted as evidence indicate that plaintiff and his subordinate Tabbert were primarily in charge of communicating with the temporary employee agencies and managing the temporary workers.[19]

Thus, the Court finds that this factor also weighs in favor of defendants that plaintiff was properly classified as an exempt employee.[20]

_____

[19] Plaintiff attempts to argue that he lacked responsibility over the temporary employees because Tabbert took the lead on such activities. However, the emails in evidence demonstrate that plaintiff often communicated with the temporary agencies himself. More importantly, even if Tabbert were responsible for the same, Tabbert was one of plaintiff's direct subordinates. Such delegation to Tabbert would, therefore, have itself been a managerial act.

[20] Additionally, plaintiff's performance reviews demonstrate that upper management viewed plaintiff's management duties as primary. (*See, e.g.*, DEX 1016 (June 2013 Performance Review) (suggesting the following as areas of improvement—"(1) End the year with zero time loss accidents; (2) End the year under budget . . . ; and (3) Maintain losses under 2%.").)

United States District Court
Northern District of California

### iii. Employee's Relative Freedom from Direct Supervision

Plaintiff's central argument in this regard is that the Plant Manager, Eduardo Perez, was an aggressive micromanager, and therefore, he was not free from direct supervision. Plaintiff's testimony in this regard is corroborated by several witnesses, who all agreed that Perez was an aggressive micromanager. However, the evidence also demonstrates, as discussed above, that Perez expected plaintiff to manage the production line efficiently, and that Perez was not at the Facility, let alone on production line, at all times. Thus, this factor weighs only slightly in favor of plaintiff. Such finding is further limited as Perez was only Plant Manager through May or June 2013.[21] After such time, defendants hired Norm Wolfe as the new Plant Manager, whose management style was decidedly more flexible. Accordingly, the Court finds that with respect to the period of time after Perez was terminated, this factor weighs against plaintiff.

### iv. Employee's Salary and Wages of Other Employees Performing Non-Exempt Work

The Court finds that this factor also weighs in favor of finding that plaintiff was properly classified as exempt. The parties stipulated to the following wages for plaintiff's subordinates: (i) Trung Bui, $14.38; (ii) Leopoldo Martinez, $14.86; (iii) Maria Carillo, $15.60; (iv) Erick Campista, $15.82; (v) Carlos Sanchez, $16.33; (vi) Francisco Flores, $17.76; (vii) Marco Flores, $17.95; (viii) Keith Bright, $17.97; (ix) Jose Mora, $18.92; and (x) Dennis Tabbert, $25.57. (SFs 9–19.) Plaintiff, by contrast, earned $1,263.29 a week through June 18, 2013 and then $1,263.29 until the end of the Relevant Period. (SFs 7–8.) Such translates to approximately $30.96 and $31.58 per hour for a regular 40-hour workweek. Thus, plaintiff's pay was approximately twice that of most of his subordinates, except for Tabbert who served as the lead production operator.

---

[21] Furthermore, some evidence demonstrates that despite Perez's reputation, plaintiff was still expected to make decisions within his sphere of influence independently. (*See* Trial Tr. 181:23–182:7 ("Q: Okay. What I was getting at is you mentioned the efficiency of the line may be affected by a breakdown. So if—if Eduardo was on the premises and there was a breakdown, would you, in your practice, immediately notify him? A: Not necessarily because I would—immediately I would be [sic] to try to fix the problem and get the line back running. Because if I went in his office to—to let him know the line was down, he'd basically ask me what the [expletive] I was doing in his office. So that's his style.").)

United States District Court
Northern District of California

Accordingly, the Court finds that plaintiff's primary duty was management rather than his time spent working as a machine operator on the line.

### b. Hiring, Firing, Change of Status, and Recommendations

The evidence in the record demonstrates that plaintiff did not have the authority to hire, fire, or effectuate a change of status for any employees. Thus, the Court must analyze whether plaintiff's recommendations regarding the same were given particular weight during the Relevant Period. Importantly, the Relevant Period here only consisted of approximately one year and two months, during which the Facility was facing significant problems that resulted in the shutdown of the whole enterprise by the end of the Relevant Period. Thus, opportunities for hiring new employees were reasonably limited.

Regardless, even against this backdrop, the record demonstrates that plaintiff's recommendations regarding employment were taken into consideration by the Plant Manager and company executives. For instance, as discussed above, plaintiff was approved to hire a new line operator in 2013. However, plaintiff decided that he would prefer to continue using a certain temporary worker and decide later on whether to hire the same. Defendants deferred to plaintiff's sole judgment in this regard. Additionally, plaintiff's recommendations regarding pay increases were also given particular weight during the Relevant Period. (*See supra.*) Plaintiff's recommendations in this regard were adopted, except for his recommendation as to Tabbert who received 2% instead of his recommended 1% raise. (Trial Tr. 897:4–16 (House).)

Accordingly, the Court finds that plaintiff's recommendations with regard to employment were given particular weight thereby satisfying this statutory requirement for designation as an exempt employee.

### 2. Summary

Because plaintiff satisfies all requirements for the statutory exemption as an executive under the FLSA, the Court finds that plaintiff was properly classified as exempt during the Relevant Period. Accordingly, the Court need not address the issue of damages.

## V. CONCLUSION

For the foregoing reasons, and given the totality of the circumstances, the Court **FINDS** that plaintiff was properly classified as exempt during the Relevant Period and **RULES** in favor of defendants. No later than **Monday, June 12, 2017**, the parties shall submit a joint statement including language for a form of judgment, approved as to form.

**IT IS SO ORDERED.**

Dated: June 1, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California